**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**ELKINS DIVISION**

**STEPHANIE MAUREEN MCKENZIE,**

      **Plaintiff,**

**v.**                               **Civil Action No. 2:14-CV-52**
                                          **JUDGE BAILEY**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

      **Defendant.**

**REPORT AND RECOMMENDATION**

**I.   INTRODUCTION**

On July 2, 2014, Plaintiff Stephanie Maureen McKenzie ("Plaintiff"), by counsel, Brian D. Bailey Esq.,  filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Complaint, ECF No. 1).  On September 12, 2014, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings.  (Answer, ECF No. 6; Administrative Record, ECF No. 7).  On September 25, 2014, and October 23, 2014, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment.  (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 10); (Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 12)  On December 10, 2014, the parties presented oral arguments on their respective motions before United States Magistrate Judge Robert W. Trumble.  Brian D. Bailey, counsel for Plaintiff, and Kimberly Varillo, Assistant United States Attorney, participated by telephone.  Following the oral argument hearing and review of the motions and the administrative

record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.   BACKGROUND

### A.   *Procedural History*

On July 19, 2011, Plaintiff protectively filed a Title II claim for disability insurance benefits ("DIB"), Child's Insurance Benefits ("DAC") and a Title XVI claim for supplemental security income ("SSI"), alleging disability that began June 1, 2004. (R. 149-52, 159-62, 153-58). Her claims were initially denied on September 14, 2011 and again upon reconsideration on December 20, 2011. (R. 62-5). Plaintiff filed a request for a hearing, which was held before United States Administrative Law Judge ("ALJ") Jeffrey La Vicka on February 27, 2013 in Morgantown, West Virginia. (R. 119-42, 34-61). Plaintiff, represented by Brian Bailey, Esq., appeared and testified, as did Alina Kurtanich, a vocational expert. (Id.) On March 11, 2013, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act ("Act"). (R. 15-31) On June 19, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1-7). Plaintiff now requests judicial review of the ALJ's decision finding her not disabled.

### B.   *Personal History*

Plaintiff was born on April 1, 1986 and was eighteen (18) years old at the time of her alleged onset date of disability. (R. 159). Plaintiff has a high school degree, with no special education programming and no additional vocational training. (R. 189). Although Plaintiff worked at a grocery store pharmacy as a pharmacy tech for a month, the ALJ labeled it an unsuccessful work attempt and found Plaintiff had no work experience. (R. 18). Plaintiff was twenty-six (26) years

old at the time of the administrative hearing. (R. 38). She has no children and lives with her mother, sister, her sister's husband, her sister's four children and occasionally her mother's boyfriend. (R. 38-40). Plaintiff's complaints include: depressive disorder, combined with hypothyroidism, a mitral valve prolapse and schizophrenia. (R. 37). Further, Plaintiff complains that only her schizophrenia impairment meets a listing. (R. 38).

### C.   Relevant Medical History

On May 13, 2011, Plaintiff was admitted to the Psychiatric Facility at United Hospital Center and later to Stonewall Jackson Memorial Hospital for stabilization of psychosis and mood. (R. 237-238, 243-297). Her mother took her to the hospital after Plaintiff reported to her that she was hearing voices and they were telling her she had to kill to protect her family. (R. 600). Plaintiff was prescribed Risperdal and was discharged on May 27, 2011. (R. 241). On May 31, 2011, Elizabeth J. Bates, Evaluator United Hospital Center wrote that Plaintiff was diagnosed with schizophrenia and that the recommended treatment plan was for Plaintiff to receive Targeted Case Management (hereinafter, "TCM") services, where United Summit Center (hereinafter "USC") would complete a psychiatric diagnostic interview of Plaintiff to aid in diagnosis, evaluate medication efficacy and make treatment recommendations. (R. 240).

United Summit Center ("USC") treated Plaintiff for her mental health issues from May 31, 2011 through December 4, 2012. (R. 598-619). Her intake information gave the history of her hospitalization for her recent psychotic episode. Additionally, it noted that Plaintiff "denies that she experienced symptoms of mental illness prior to the development of psychosis; her mother confirms this;..." (R. 601). As of May 31, 2011, Plaintiff reported that she no longer heard voices commanding her to act, but she still heard voices. (R. 601). Plaintiff was diagnosed with

schizophrenia and treatment was to receive TCM services. (R. 602)

On June 24, 2011, Plaintiff had a psychiatric intake evaluation at United Summit Center by Junemarie Williams, FNP-BC. (R. 241-242). Her mental status exam showed that she was "alert and oriented in person." (R. 242). Her mood was "decent" and her affect was "flat." (Id.). She denied any hallucinations. (Id.). She denied any suicidal or homicidal ideation. (Id.). Although her insight and judgement were poor, her attitude was good and cooperative. (Id.).

> She could perform mental arithmetic without any problems. She could remember a*pple-table-grass* at one, three and five minutes. She knew who Christopher Columbus, William Shakespeare, and Abraham Lincoln were. She could spell world backwards and forward, and could tell similarities and differences between words.

(R. 242).

On July 5, 2011, Plaintiff followed up with her primary care physician, Dr. Bennett Orvik of Primary Healthcare Associates. (R. 307). Dr. Ovik noted that Plaintiff was "here for recheck after a recent hospitalization for dehydration and psychiatric problems. She has subsequently been at Summit Center, and they apparently confirmed my suspicion that the diagnosis is schizophrenia." (Id.). Plaintiff's chief complaints was tiredness, dizziness and lightheadedness. (Id.). Dr. Orvik made no changes to her medication at that time and recommended a follow-up in four months. (R. 309).

On August 31, 2011, Plaintiff met with her primary physician, Dr. Orvik complaining of dizziness and weakness. (R. 504). Dr. Orvik's notes reflected that Plaintiff had not been taking her risperdal lately and was not currently on any psychiatric medication. (Id.). Dr. Orvik noted physical findings were normal and his assessment was Vestibular Neuronists and Schizophrenia. (R. 505). His plan was for her to start taking the risperdal again and follow up in one month. (R. 505).

On September 13, 2011, a psychiatric review technique was completed by James Bartee, Ph.D. (R. 486-499). Dr. Bartee's form report stated that Plaintiff's schizophrenia was severe but did not meet a listing and was not expected to last 12 months. (R. 486). Dr. Bartee rated her functional limitations as mild with regard to Daily Living, Social Functioning and difficulties in maintaining concentration, persistence or pace. (R. 496). Additionally, he noted that the "Evidence does not establish the presence of 'C' criteria." Dr. Bartee thoroughly noted his review of the medical records. (R. 498). He noted in so doing that the diagnosis of schizophrenia was not consistent with the DSM and the presence of visual hallucinations was unusual in schizophrenia but not precluded. (Id.). Further he provides that "I believe we should provide a duration denial for the claim with a re-eval of 5/1/2012. As she was functionally normally prior to this episode the "B" Criteria suggest she will non-severe by 5/1/12 if she remains Tx/RX compliant." (Id.).

On September 16, 2011, Plaintiff presented with her mother at United Summit Center, her mental health provider, for review assessment of her mental disorders. (R. 603). The review assessment was completed by a non-physician and noted as follows regarding Plaintiff's current Mental Status: Plaintiff appeared younger than her stated age. Her affect was normal, her mood was euthymic and her speech was goal directed and logical. She was oriented to all four spheres. Plaintiff "reported that she currently does not experience auditory or visual hallucinations." (R. 605). The recommended treatment was for Plaintiff to continue with TCM and pharmacological management. (R. 605).

On October 19, 2011, Plaintiff met with Dr. Ovik for a follow-up/routine visit. (R. 501). Plaintiff's chief complaint at that time was irregular heartbeat and fainting spells. (Id.). Dr. Orvik

reported that according to her mother, Plaintiff's psychiatric symptoms had been better lately. (R. 501). Dr. Orvik's assessment was prolapsing mitral valve leaflet syndrome and schizophrenia. (R. 502). His plan was to try her on popranolol HCI 20 MG TABS and follow up in a month. (R. 503).

On November 17, 2011, Plaintiff presented to her primary care physician, Dr. Orvik for routine follow up and complained that she has again had episodes of passing out. (R. 573).

On December 19, 2011, Dr. Comer, a psychologist, affirmed Dr. Bartee's September 2011 mental assessment of the Plaintiff. (R. 507).

On December 20, 2011, Dr. Parikshak, internal medicine specialist, affirmed the RFC that Dr. Bartee gave in September 2011. (R. 508).

On December 19, 2011, Plaintiff met with Dr. Algahdban, a neurologist with Associated Specialists. (R. 546). She complained of episodes of passing out. Upon physical examination everything tested normal. Dr. Algahdban concluded that her episodes of unresponsiveness were most likely psychological.

On January 4, 2012, Plaintiff presented at USC for a review assessment of her mental disorder. (R. 607). Plaintiff reported that her symptoms had stabilized with the use of her current medication. (Id.). Plaintiff further stated that she still occasionally heard voices but they were good voices. (Id.). She further stated that she was seeking treatment from a neurologist . (Id.) Additionally she was experiencing dizziness and fainting. (R. 607).

On January 9, 2012, Dr. Alghaban noted that Plaintiff presented today with a history of passing out. (R. 545). An EEG was requested to rule out epileptiform activity. (Id.). The EEG was normal. (Id.).

On January 16, 2012, Dr. Alghaban noted that Plaintiff had a history of daytime sleepiness

and snoring at night. (R. 544). He noted she was having passing out spells that may be psychogenic. (Id.). A 24 hour EEG was negative. (Id.). Sleep study was positive. (Id.). Plaintiff was scheduled for a second night sleep study and started on Tegretol. (Id..).

On January 23, 2012, Plaintiff presented to her primary care physician, Dr. Orvik, complaining of problem with her nose being sore and a place sticking up from her sleep apnea mask. (R. 567). Dr. Orvik assessed Plaintiff with Hypothyroidism, Hirsutism, and Schizophrenia and requested Plaintiff consult with Endocrinologist. (R. 569).

On February 13, 2012, Dr. Alghaban noted Plaintiff's examination was normal. (R. 543). Plaintiff was to continue with Tegretol and start with CPAP machine. (Id.).

On February 16, 2012, Plaintiff presented to her primary care physician, Dr. Orvik, for a routine follow-up with labs but also reported having an infected tooth. (R. 564). Testing was normal and Dr. Orvik's assessment was periodontal abscess. (R. 565). Plaintiff was to continue on medications and have a follow-up appointment in three months. (R. 566).

On March 8, 2012, Dr. Alghaban wrote a follow-up note for Plaintiff who suffered from daytime sleepiness and snoring at night. He reported that she is currently on CPAP machine and Tegretol, which seemed to be helping. (R. 542).

On April 10, 2012, Plaintiff presented to her primary care physician, Dr. Orvik, with complaints that she had some chest pain, palpitations and some stressful situation at home recently. (R. 561). Dr. Orvik's assessment was chest pain, obesity and schizophrenia and had her continue on current medications. (R. 563).

On April 20, 2012, Plaintiff presented with her mother at USC for another review assessment of her mental disorder. (R. 611). Plaintiff reported that she had been doing better since she started

her medication and felt better than she did in the past. (Id.) Her mother reported that their gas line needed to be repaired and they had been without hot water. (Id.). Plaintiff reported that she was meeting with a specialist to determine why she was having her fainting spells. (Id.). Treatment was to continue to receive pharmacological management services through USC. (R. 613).

On May 21, 2012, Plaintiff presented to her primary care physician, Dr. Orvik, for a hypertension follow-up. (R. 558). Dr. Orvik noted that Plaintiff was doing fairly well lately and was having an endocrine work up by Dr. Soule, which was not complete yet. (Id.). All testing was normal and Dr. Orvik assessed Plaintiff with obesity and schizophrenia and ordered continuation on current medication. (R. 559).

On June 7, 2012, Plaintiff reported to Dr. Ross at the United Hospital Center Emergency Room by ambulance after passing out in Dr. Soule's office. (R. 518). The records indicated that Plaintiff alleged having similar symptoms over the past year and had been evaluated multiple times at another hospital for syncope and chest pain. Most recently she was evaluated two days ago. She stated that her findings are benign and she was discharged. (R. 518). All tests came out normal and Dr. Ross's impression was no abnormalities identified on unenhanced CT of her brain. (R. 520).

On June 11, 2012, Plaintiff reported to Dr. Alghaban for follow-up on her sleep apnea. (R. 540). Dr. Alghaban reported that she is on a CPAP machine. (Id) She has numbness in both hands and was still falling asleep and having episodes of unresponsiveness. (Id.). The Doctor's plan was to treat the numbness in the hands as carpal tunnel and to run an EEG and autonomic function testing for her dizziness and sleep problems. (R. 550).

On June 12, 2012, Plaintiff presented to her primary care physician, Dr. Orvik with her chief complaint that her problems with passing out were getting worse. (R. 555). Dr. Orvik assessed

Plaintiff with Vasovagal syncope and Schizophrenia and her treatment was to continue on medication. (R. 557).

On August 6, 2012, Dr. Alghaban, Plaintiff's neurologist, had a follow-up appointment with Plaintiff. (R. 539). Dr. Alghaban noted in a letter to the file that Plaintiff had a history of seizures vs. pseudosiezures and suffered from obstructive sleep apnea syndrome. (R. 538). Her EEG was negative and at this appointment she showed normal mental status. (Id). His plan was to continue her on Epitol and Seroquel which seemed to be helping her and follow up in three months. (R. 538).

On August 20, 2012, Plaintiff presented to USC with her mother for current level functioning assessment and to see if any modifications needed to be made to her treatment. (R. 614). Plaintiff reported that she had anxiety around other people, had trouble focusing and was easily distracted. (R. 614). Plaintiff reported that she had been switched from Risperdal, which made her gain weigh,t to Seroquel which helped her sleep. (R. 615). There was a note that Plaintiff's mother did most of the talking at the assessment. (Id.). Treatment was to continue to receive pharmacological management services through USC. (Id.).

On August 27, 2012, Plaintiff presented to her primary care physician, Dr. Orvik, with a complaint of wrist pain. (R. 553). Dr. Orvik's assessment was wrist sprain and he ordered x-rays and a follow-up appointment. (R. 554).

On September 18, 2012, Plaintiff met with her primary care physician, Dr. Orvik, for follow-up routine care. (R. 551). The check up was normal and Plaintiff was to continue on her current medication. (R. 552).

On November 6, 2012, Plaintiff reported to the United Hospital Emergency room for nausea, vomiting and diarrhea. (R. 584). Plaintiff had a CT scan of her abdomen which was normal (R.

587).  Diagnosis was virus and Plaintiff was discharged.  (R. 589).

On December 4, 2012, Plaintiff and her mother  presented for her review assessment from USC.  At this appointment, Plaintiff reported that she was happy and felt great.  (R. 617).  Further she hadn't heard any voices in two months.  (Id.).  Plaintiff reported that she was able to go black Friday shopping without feeling anxious.  Plaintiff reported that her fainting spells had increased over the last month and the cause was unknown.  (R. 618).  The assessment noted that Plaintiff's mom would interrupt her while she was speaking; or Plaintiff would look to her mother for answers to questions.  (R. 619).

On February 8, 2013 and February 19, 2013, Plaintiff was evaluated by Psychologist Tony R. Goudy at the request of her attorney.  (R. 620).  The purpose of the evaluation was to determine if psychological factors could be adversely affecting her ability to pursue substantial employment.  (Id.).  Based on the review of the medical records and only two meetings with the Plaintiff, Dr. Goudy found that the Plaintiff met both B and C listings of 12.03 listing.  (R. 626).

On February 22, 2013, Nurse June Marie Williams of the United Summit Center wrote to Plaintiff's attorney with her opinions regarding Plaintiff's mental health.  (R. 628).  Ms. Williams opined that Plaintiff suffered from schizophrenia and dependent personality disorder.  (Id.)  She further opined that "in a work setting she would experience difficulty staying on task and interacting appropriately  with  other  individuals."  (Id.).  F.N.P.  Williams noted that Plaintiff's medical treatment had helped and she continued to be able to function within her home environment without additional breakdowns but that she had little capacity to work because of her dependence on her mother.  (Id.).

*D.* *Testimonial Evidence from ALJ Hearing*

At the ALJ hearing held on February 27, 2013, Plaintiff testified regarding her personal life and finances. Plaintiff testified that she was twenty-six years old and that her birth date was April 1, 1986. (Id.). She is five feet and one inch tall and weighs 197 pounds. (Id.). She is single, has no children and still resides in her mothers home. (Id.). Plaintiff's sister, her sister's husband, her niece, her three nephews and her mother's boyfriend also live in her mother's home with her. (R. 39). Plaintiff's mother is currently on social security for a physical disability. (R. 40). Plaintiff does not drive and has never obtained her driver's license. (R. 42).

Plaintiff has a high school diploma. (R. 43). Her only job was at Kroger's pharmacy in 2007, where she worked for six weeks or less. (R. 44). Plaintiff alleges she lost that job because she was hearing voices and she couldn't operate the computer. (R. 51). Plaintiff has not looked for a job since then because her fainting, tiredness and voices make it hard for her to concentrate. (R. 45). Plaintiff hasn't baby-sat for her sisters children since 2007 except for once last year. (R. 41).

Plaintiff testified that the conditions she believes most interfere with her ability to work are her schizophrenia and mitral valve prolapse. (R. 45). Plaintiff's counsel argued at the ALJ hearing that the Plaintiff's schizophrenia meets or equals listing 12.03. (R. 38). Her mitral valve prolapse causes her to be tired, faint and her heart to beat funny. (Id.). She crushed her left elbow when she was eight and because of that, her left wrist gets sprained a lot and its hard to do anything. (Id.). Plaintiff has a medical card. (R. 46). She was taking medications for hyperthyroidism, irregular heartbeat, schizophrenia and seizures and an inhaler for asthma. (R. 47). The side effects of her medications are being tired and very groggy and she sometimes feels faint. (R. 47). Plaintiff testified that she passes out 10-15 times at night sometimes and during the day the same depending

on what she was doing.  (R. 52).  Plaintiff claims she was abused when she was younger from

bullying when she lived in Texas.  (R. 55).  She stated that she heard voices every day in her head.

(R. 55).

As for daily living,  Plaintiff testified that she dresses and bathes herself but at this time they

had no water.  (Id.).  She did not have a cell phone and she does not cook.  (Id.).  Plaintiff uses the

microwave, goes shopping daily and makes beds.  (R. 48).  Plaintiff does not cook or do dishes or

laundry.  (Id.)  She has one indoor cat and four outside cats but other people in the family feed them.

(R. 49).  In her spare time, Plaintiff plays on her computer and reads books.  (R. 49).  She has been

writing a fictional book since she was nine years old and is only half completed. (R. 49-50).

Plaintiff also collects toys as a hobby, utilizing e-Bay on the Internet for some purchases.  (R. 50).


**E.**     ***Vocational Evidence from ALJ hearing***

Also testifying at the hearing was Alina Kurtanich, a vocational expert.  (R. 57).  The ALJ

found that Plaintiff had no past relevant work and therefore, proceeded with a hypothetical regarding

Plaintiff's ability to perform light work:

> Q:     ...Ms. Kurtanich, assume a hypothetical individual of the same, age,
> education and work experience as the claimant; retains the capacity to
> perform light work with a sit/stand option allowing the person to briefly, for
> one to two minutes, alternate sitting or standing positions at 30- minute
> intervals without going off task; who's limited to occasional posturals except
> to climbing of ladders, ropes, or scaffolds; who must avoid all exposure to
> unprotected heights, hazardous machinery, and commercial driving; whose
> work is limited to simple, routine, and repetitive tasks requiring only simple
> decisions with no fast paced productions requirements and few workplace
> changes; who is to have no interaction with coworkers and supervisors.  Are
> there jobs in the regional or national economy that such an individual could
> perform?
>
> A:     Yes, Your Honor.  This individual could perform the following positions.  A

marker, DOT number 229.587-018, SVP: 2, light, over 160,000 positions in existence in the national economy, over 14,000 in the state of West Virginia. Also position as a sorter, <u>DOT</u> number 222.687-014, SVP: 2, light over 280,000 in the national economy, over 24,000 in the state of West Virginia, and also a position as a mail clerk, DOT number 209.687-026, SVP: 2, light, over 170,000 positions in the national economy, over 7, 500 in the state of West Virginia.

The Vocational Expert further testified that employers usually tolerate one day absent or late per month; that there are customarily three scheduled breaks during a work day: one in the morning, one in the afternoon for 15 minutes and a half hour for lunch. (R. 59). Additionally, a typical employer will allow an employee to be off task 15 percent of their work day in addition to scheduled breaks. (<u>Id.</u>). If an employee were off task more time than this there would be no jobs available for her. (R. 60).

### F.     *Lifestyle Evidence*

In a Disability Report dated August 2, 2011, the telephonic interviewer, E. Murphy, noted that the Plaintiff had to ask her mother for the answers to all her questions. (R. 178). In an adult function report dated August 2, 2011, Plaintiff stated she last worked on December 2, 2007. (R. 188). Her employer let her go because she did not understand the computer program. (R. 188). She stated that her conditions kept her from working from June 1, 2004. (<u>Id.</u>). Her conditions did not cause her to make changes in her work activity. (<u>Id.</u>). Plaintiff graduated high school in 2005 without the need of special education classes. (R. 189). At her last job, she filled prescriptions, stocked medicines and  checked out customers. (R. 190).

On an adult function report dated August 31, 2011, Plaintiff stated that her conditions cause her to have trouble concentrating/focusing/remembering. (R. 196). She is light headed, dizzy, faints, hears voices and her activity is limited because she has little energy and is weak. (R. 196).

As for her typical day, Plaintiff states that she tries to get her breakfast, if she can't her mom does. (Id.). She feeds her cats, reads, occasionally plays video games, looks at her toy collection, gets on the computer, brushes her teeth and tries to help her mom when she can. (R. 197). Plaintiff tries to help her mom by getting her mom water or pop and trying to fix something in the microwave. (R. 197). She feeds and waters her cat. When she can't, her mom does and her mom cleans the litter box. (R. 197). Plaintiff alleges that she used to be able to take care of her mom, check mail, help with garbage, cleaning of house and groceries before her condition. (Id.). Plaintiff takes care of most of her personal grooming except sometimes her mom lays out her clothes and helps her with brushing and combing her hair. (Id.). Her mom reminds her about grooming and medicines. (R. 198). Plaintiff writes that she does not do house or yard work because of her dizziness and fainting and because she is heat/cold intolerant and has little energy. (R. 199). She used to go outside daily but not now because of dizziness and fainting. (Id.). Plaintiff does not have a license, does not go out alone and is afraid of driving. (Id) Plaintiff shops probably twice per week with her mom. (Id.).

With regard to managing money, Plaintiff states in her adult function report that she can write checks but it's her mom's checking account and her mom balances it. (Id.). With regard to her hobbies, Plaintiff states that she enjoys reading, photography, artwork, writing, computer, video games and collecting toys. (R. 200). She doesn't do them as much any more because she sleeps more. (Id.). With regard to social activities, Plaintiff stated that she talks, shops and fixes food with her mom. With her friends she talks, play games and her mom takes them shopping. (Id.). Further she states that on a regular basis she goes to Wal-Mart, Krogers, doctor's appointments, Tractor Supply and convenience stores but she does need someone to accompany her. (Id.). She

does not have any problems getting along with family, friends or neighbors.  (Id.).

With regard to how her conditions affect her abilities, Plaintiff listed the following: lifting, squatting, bending, standing, walking, sitting, kneeling, hearing, stair climbing, seeing, memory, completing tasks, concentration, understanding and following instructions.  (R. 201).  The Plaintiff goes on to state the reasons each of these abilities are affected.  Her crushed elbow and broken wrist from when she was younger affects her ability to lift.  (Id.).  Her dizziness, light headedness and fainting affect her ability to squat, bend, stand, walk, sit, kneel and climb stairs.  Her hearing is affected when she hears voices and her mind is elsewhere. Her seeing is sometimes blurred.  Her memory, completing tasks, concentration, understanding, and following instructions are affected by her trouble staying focused, trouble remembering and her getting distracted.  (Id.).

Plaintiff further wrote in her adult function report that she could walk only a few feet before she needed to stop and rest.  (Id.).  She needed thirty minutes to an hour and half before she can resume walking.  (Id.).  She follows written instructions "very well."  (Id.).  She does not follow spoken instructions well and forgets.  (Id.).  Plaintiff gets along "very well" with authority figures. (R. 202).  She does not handle stress or changes in routine well.  (R. 202).  She was taking Risperdal which made her feel tired, weak, dizzy, light-headed and faint.   (R. 203).

An affidavit written by her former Kroger supervisor, Molly Ramsey, on February 25, 2013, describes Plaintiff as "child-like."  (R. 221).  Ms. Ramsey states that until Plaintiff began working at the Pharmacy, she did not realize how severely limited she was.  (R. 221).  Plaintiff could not alphabetize drugs to get them correctly back onto storage shelves and she made mathematical mistakes in subtraction.  Ms. Ramsey describes Plaintiff as a "slow learner" and noted that she could not comprehend the use of their computer system.  (R. 222).  After one month of near-constant

accommodations, Kroger let her go.  (Id.).

## III.    CONTENTIONS OF THE PARTIES

In her Motion for Summary Judgment, Plaintiff raises three issues. (Pl.'s Br. in Supp. of Mot.

for Summ. J. ("Pl.'s Br.") at 1, ECF No. 11). Specifically, Plaintiff alleges that:

- The ALJ failed to account for Ms. McKenzie's mitral valve prolapse impairment at step two of the Sequential Evaluation.
- The ALJ did not cease the Sequential Evaluation at step three despite the medical factors alone indicating a listing level schizophrenia condition.
- The ALJ performed a step four credibility analysis and residual functional capacity evaluation that was unnecessary and, ultimately, faulty as the ALJ did not provide substantial evidence to support his position that Ms. McKenzie did not suffer from a listing level schizophrenic disorder or that Dr. Goudy's opinion deserved less than significant weight.

(Pl.'s Br. at 1, ECF No. 11).  Plaintiff requests that the court remand this case for the sole purpose

of calculating benefits as the ALJ performed a faulty step two analysis, failed to cease the Sequential

Evaluation at step three despite medical factors showing a listing level condition, and unnecessarily

performed a step four evaluation.  (Pl.'s Br. at 15).

Defendant, in her Motion for Summary Judgment, asserts that the decision is supported by

substantial evidence and should be affirmed as a matter of law. (Def.'s Mot. at 1). Specifically,

Defendant alleges that:

- The issue of whether the ALJ found Plaintiff's mitral valve prolapse severe or non-severe is not legally relevant since the ALJ found at least one impairment severe, proceeded beyond step two of the sequential process and assessed Plaintiff's RFC wherein all impairments were taken into account.
- Substantial Evidence supports the ALJ's finding that Plaintiff did not meet or equal Listing 12.03.
- The ALJ properly found that Dr. Goudy's opinion that Plaintiff met Listing 12.03 was not entitled to controlling weight.
- The ALJ properly assessed Plaintiff's credibility.

Def.'s Br. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Br.) at 1-15, ECF No. 13).

## IV.    STANDARD OF REVIEW

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." Hays, 907 F.2d at 1456 (citing Laws, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## V.    ANALYSIS

### A.    *Standard for Disability and the Five-Step Evaluation Process*

To be disabled under the Social Security Act, a claimant must meet the following criteria: An individual shall be determined to be under a disability only if his physical or mental impairment

or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country. See 42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
> (iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.
> [Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ."
> 20 C.F.R. §§ 404.1520, 416.920 (2011).]
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920 (2011). If the claimant is determined to be disabled or not disabled at any of the five steps, the process does not proceed to the next step.

**B.**  ***Discussion of the Administrative Law Judge's Decision***

Utilizing the five-step sequential evaluation process, the ALJ made the following findings:

1.     Born on April 1, 1986, the claimant had not attained age 22 as of March 31, 2004, the alleged onset date (20 CFR 404.102, 416.120(c)4) and 404.350(a)(5)).

2.     The claimant has not engaged in substantial gainful activity since March 31, 2004, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.*).

3.     The claimant has the following severe impairments: osteoarthritis; schizophrenia. (20 CFR §§404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) lifting up to 20 pounds occasionally, lifting and carrying up to 10 pounds frequently, standing and walking for up to six hours and sitting for up to six hours in an eight-hour workday, with normal breaks; allowing the person to briefly, for one to two minutes, alternate sitting or standing positions at 30 minute intervals without going off task; performing all postural movements occasionally, except never climbing ladders, ropes and scaffolds; avoiding all exposure to unprotected heights, hazardous machinery and commercial driving; limited to simple, routine and repetitive tasks, requiring only simple decisions, with no fast-paced production requirements and few work place changes; and only occasional interaction with coworkers and supervisors and no interaction with the public.

6.     The claimant has no past relevant work. (20 CFR §§404.1565 and 416.965).

7.     The claimant was born on April 1, 1986 and was 17 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English.. (20 CFR §§ 404.1563 and 416.963).

9.     Transferability of job skills is not an issue because the claimant does not have past relevant work. (20 CFR 404.1568 and 416.968). .

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the

national economy that the claimant can perform. (20 CFR 404.1569, 404.1569(a) and 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a "disability,"as defined in the Social Security Act, from March 31, 2004 through the date of this decision. (20 CFR §§ 404.350(a)(5), 404.1520(g) and 416.920(g)).

(R. at 15-34.)

## C.   *Analysis of the Administrative Law Judge's Decision*

### 1.   **The ALJ's failure to mention Plaintiff's mitral valve prolapse during step two of the sequential evaluation was harmless error.**

At step two of the sequential evaluation, the claimant bears the burden of production and proof that he had a severe impairment. Grant v. Schweiker, 699 F.2d 189, 191 (4th Cir. 1983). To be "severe," an impairment or combination of impairments must significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c), 416.920(c). An impairment is severe when, whether by itself or in combination with other impairments, it significantly limits a claimant's physical or mental abilities to perform basic work activities. 20 C.F.R. § 404.1520(c). Any impairment must result from abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1508. Unless the impairment will result in death, it must have lasted or be expected to last for a continuous period of at least twelve months. 20 C.F.R. § 404.1509. Moreover, a mere diagnosis of a condition is insufficient to prove disability; instead, there must be a showing of related functional loss. See Gross v. Heckler, 785 F.2d 1163, 1165 (4th Cir. 1986). Furthermore, "[t]he severity standard is a slight one in this Circuit." Stemple v. Astrue, 475 F. Supp. 2d 527, 536 (D. Md. 2007). "[A]n impairment can be considered as 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work,

irrespective of age, education, or work experience." <u>Evans v. Heckler</u>, 734 F.2d 1012, 1014 (4th Cir. 1984).

In the present case, Plaintiff argues that the ALJ erred at step two of the sequential evaluation because the ALJ does not account for Ms. McKenzie's mitral valve prolapse. The ALJ does not mention Plaintiff's mitral valve prolapse in step two of the sequential analysis because Plaintiff provided no medical evidence that this condition caused a related functional loss. Plaintiff's mitral valve prolapse is merely listed as part of her medical history (R. 272-97, 310, 340, 364). There is nothing in the record suggesting that this condition is causing any functional loss. Plaintiff cites to Dr. Orvik's records (R. 501-504) stating that Plaintiff's mitral valve prolapse is a severe impairment. (Pl.'s Br. at 2). However at that check up and numerous others, her cardiovascular examination findings were all normal, with no chest pain or discomfort and no murmurs (R. 312-15, 317-27, 501-04, 555-56, 558-59, 561-62)

Although Plaintiff testified at the ALJ hearing that she believed her mitral valve prolapse interferes with her ability to work because it causes her to be tired, faint and her heart to beat funny, the medical evidence does not support this allegation. (R. 45). In fact, Dr. Alghaban, her treating neurologist, believes her dizziness and fainting to be psychogenic; therefore, not related to her mitral valve prolapse. (R. 544). Dr. Orvik, her primary care physician, designated her fainting episodes as vasovagal syncope, which is a nerve issue and unrelated to Plaintiff's mitral valve prolapse condition. (R. 555). There is simply no medical evidence connecting her alleged symptoms of dizziness, fainting and being tired to the mitral valve prolapse. The ALJ's error is that he should have so stated in his opinion.

Plaintiff is correct in asserting that the ALJ did not mention mitral valve prolapse in step two

of the sequential evaluation. However, a failure by the ALJ to specifically find the mitral valve prolapse as not severe would not constitute reversible error. A step two error is harmless if the ALJ "continued through the remaining steps and considered all of the claimant's impairments." <u>Syms v. Astrue</u>, No 10-CV-499-JD, 2011 WL 4017870, at *1 (D.N.H. Sept. 8, 2011); <u>see also</u> <u>Mauzy v. Astrue</u>, No. 2:08-CV-75, 2010 WL 1369107, at *6 (N.D. W. Va. Mar. 30, 2010) (finding that it was "not reversible error for the ALJ not to designate any of the plaintiff's other medical conditions as severe or not severe in light of the fact that he did, during later steps of the sequential evaluation process, consider the combined effect of all of the plaintiff's impairments"); <u>see also</u> <u>Pompa v. Comm'r of Soc. Sec.</u>, 73 F. App'x 801, 803 (6th Cir. 2003) (explaining that "[b]ecause the ALJ found that Pompa had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence. As the ALJ considered all of Pompa's impairments in her residual functional capacity assessment finding, Pompa's argument is without merit.").

Here, the ALJ considered the combined effect of all of the plaintiff's impairments in her RFC, considering all her alleged symptoms and concluded that Plaintiff could perform light work with certain limitations. (R. 21). Accordingly any error in failing to mention mitral valve prolapse at step two of the sequential evaluation was harmless error.

"The court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1038 (9th Cir. 2008); <u>see also Keys v. Barnhart</u>, 347 F.3d 990, 994-95 (7th Cir. 2003) ("The doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions"); <u>Hurtado v. Astrue</u>, 2010 WL

3258272, at \*11 (D.S.C. July 26, 2010) ("The court acknowledges there may be situations in which an error in an opinion is harmless because it would not change the outcome of the ALJ's decision"); cf. Ngarurih v. Ashcroft, 371 F.3d 182, 190 n. 8 (4th Cir. 2004) ("While the general rule is that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained, reversal is not required where the alleged error clearly had no bearing on the procedure used or the substance of the decision reached.").

The undersigned finds that substantial evidence supports the ALJ's finding and the failure to discuss her conditions of mitral valve prolapse at step two of the sequential evaluation was harmless error.

**2.      Substantial evidence supported the ALJ's conclusion that Plaintiff did NOT meet Listing 12.03; therefore it was proper for the ALJ to proceed on to step four of the sequential analysis.**

**(a).      Substantial evidence supported the ALJ's finding that the Plaintiff did not meet Listing 12.03.**

Plaintiff's principal argument is that the ALJ erred by finding that Plaintiff did not satisfy the requirements of Listing 12.03 Schizophrenia.  Plaintiff argues that Dr. Goudy opined that she met the Listing and there was no other opinion contradicting his opinion.  (Pl.'s Br. at 11).  However, Dr. Bartee, a psychologist for SSA, did in fact contradict Dr. Goudy's opinion.  (R. 486-498).  Dr. Bartee thoroughly reviewed the medical records finding that "The DSM IV-TR requires the criterion SX for Schizophrenia be present for a minium of 6 months.  That is not reflected in the available MER."  (R. 498).   Further Dr. Bartee noted that "According to research on first psychotic episodes, with a Hx of no premorbid psychotic/prepsychotic functioning there

is at least a fair chance claimant will not again become psychotic, assuming her Rx is effective and she remains compliant."  (R. 498).

Perhaps most importantly, Dr. Bartee opined the following regarding Plaintiff's functional limitation and degree of limitation under the "B" Criteria of the Listings: 1.  Mild restrictions of activities of daily living.  2.  Mild difficulties in maintaining social functioning.  3 Mild difficulties in maintaining concentration, persistence, or pace.  4. One episodes of decompensation of extended duration.  (R. 496).

While Dr. Goudy made the following findings regarding Plaintiff's B criteria limitations: 1. Mild to moderate impairment of activities of daily living. 2.  Marked impairment of social functioning.  3.  Marked impairment concentration, persistence, and pace. 4.  One two-week psychiatric hospitalization.  (R. 626).

The ALJ made the following findings regarding Plaintiff's B criteria limitations: 1. Moderate limitations on activities of daily living.  2.  Moderate limitations in social functioning. 3.  Moderate limitations in concentration, persistence or pace.  4.  No repeated episodes of decompensation, which have been for an extended duration.  (R.  20-24).

The issue is whether based on Dr. Bartee's opinion, Dr. Goudy's opinion and the medical evidence of record is there substantial evidence to support the ALJ's findings with regard to Plaintiff's B criteria limitations and did the ALJ adequately provide reasons for those findings in accordance with the law.

A claimant bears the burden of demonstrating that his impairment meets or medically equals a listed impairment.  Kellough v. Heckler, 785 F.2d 1147, 1152 (4th Cir. 1986).  As the Supreme Court has stated,

The Secretary explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard. The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just "substantial gainful activity." . . . The reason for this difference between the listings' level of severity and the statutory standard is that, for adults, the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary. That is, if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits without a determination whether he actually can perform his own prior work or other work.

Sullivan v. Zebley, 493 U.S. 521, 532 (1990) (internal citations omitted).

For Listing 12.03, the "paragraph B" criteria require that the medically documented impairment determined in "paragraph A" must "result[] in at least two of the following": (1) "marked restriction of activities of daily living"; (2) "marked difficulties in maintaining social functioning"; (3) "marked difficulties in maintaining concentration, persistence, or pace"; or (4) "repeated episodes of decompensation, each of extended duration." 20 C.F.R. Pt. 404, Subpt. P, App. 1.

The difference between Dr. Bartee's opinion and Dr. Goudy's opinion is that Dr. Goudy opines that Plaintiff has "marked" difficulties in maintaining social functioning and "marked" difficulties in concentration, persistence or pace. Dr. Bartee found both of these limitation to be "mild." The ALJ found both of these limitations to be "moderate" limitations not "marked." (R. 20-24). Other than Dr. Goudy's opinion, there is nothing in the medical record indicating that Plaintiff has "marked" difficulties in social functioning, concentration, persistence and pace. In fact, on June 24, 2011, Junemarie Williams, F.N.P of United Summit Center provided a psychiatric intake evaluation noting Plaintiff:

...could perform mental arithmetic without any problems. She could remember a*pple-table-grass* at one, three and five minutes. She knew who Christopher

Columbus, William Shakespeare, and Abraham Lincoln were. She could spell world backwards and forward, and could tell similarities and differences between words.

(R. 242). Further inconsistencies in Dr. Goudy's opinion and the record are set forth below and in the ALJ's decision. The undersigned finds that the ALJ's determination that Plaintiff only had "moderate" difficulties in social functioning, concentration, persistence and pace is substantially supported by the record and therefore the ALJ's determination that Plaintiff did not meet paragraph "B" criteria in Listing 12.03 is substantially supported by the evidence and there is not error of law.

Neither Dr. Bartee nor Dr. Goudy give a sufficient analysis regarding the "C" Criteria of Listing 12.03. Dr. Bartee merely checked the box on his form stating that "Evidence does not establish the presence of the "C" criteria." Dr. Goudy opined as follows,

If she did not [meet the "B" criteria], it is my very strong opinion that she would still not be able to pursue substantial gainful activity that she would clearly meet the C criteria. With her current medication and her mother's assistance her Schizophrenia appears controlled enough to keep her out of the hospital. However, I believe that the increased mental demands of returning to work would result in significant deterioration or decompensation and may even result in another serious psychotic break.

(R. 626). However, the "C" criteria is not applicable in this case because it requires "...a documented history of a chronic schizophrenic, paranoid or other psychotic disorder of at least two years's duration...." Neither party is alleging Plaintiff had more than one psychotic episode in which Plaintiff was hospitalized for a couple of weeks in May of 2011. The ALJ held a hearing on this matter in February of 2013, which was not two years from the date of that episode. There have been no further episodes. Therefore, substantial evidence supports the ALJ's determination that the "C" criteria of Listing 12.03 was not met.

**(b).    Substantial evidence supported the weight that the ALJ gave Dr. Goudy's opinion and there was no error of law.**

The Plaintiff relies heavily on Dr. Goudy's opinion for his argument that Plaintiff meets Listing 12.03. (Pl.'s Br. at 6-10). Dr. Goudy was hired by Plaintiff's counsel in February of 2013 to perform a psychological evaluation of the Plaintiff to submit to the ALJ at the hearing that was held on February 27, 2013. (R. 620). Dr. Goudy met with the Plaintiff on two occasions. (Id.). In weighing the opinion of Dr. Goudy, the ALJ wrote:

> The Administrative Law Judge has considered the opinion of Dr. Goudy that the claimant meets the listing for schizophrenia and has been disabled since 2010, but is unable to give it significant weight in this decision. Dr. Goudy's review of the medical evidence of record was selective. He noted that USC records showed a consistent Global Assessment of Functioning (GAF) 45, while not noticing an extreme difference in the reports of her examiners at USC. Further Dr. Goudy left unexplained the claimant's numerous contradictory statements she made to him, compared to her prior reports, as well as the objective medical evidence.

(R. 28). Plaintiff also relies heavily on the opinion letter of June Marie Williams, FNP, of United Summit Center written to Plaintiff's counsel on February 22, 2013. In weighing Ms. Williams opinion the ALJ wrote:

> The Administrative Law Judge has considered the opinion of Ms. Williams that the claimant had little capacity for work and was unable to function outside of her home environment, but is unable to give it significant weight. Ms. Williams reported that the claimant continues to have auditory delusions, which she denied in August 2012 and December 2012 (Exhibit 14F). Further Ms. Williams stated that the claimant had paranoid delusions that people were thinking, focusing or talking about her. Dr. Goudy also noted this in his evaluation. In contrast, the claimant reported that she went shopping on Black Friday at Wal-Mart without anxiety in December 2012 to Ms. Suttle. The claimant reported "feeling great" and being "happy." Mrs. McKenzie attributed the claimant's hallucinations to "white noise" from the radio that she was listening to at night (Exhibit 14F).

(R. 29).

Title 20, Part 404, Section 1527(d) and Title 20, Part 416, Section 927(d) of the Code of Federal Regulations governs how the Social Security Administration weighs medical opinions. Unless controlling weight is assigned to a treating source's medical opinion, the following factors are considered in deciding how to weigh any medical opinion: (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) any other factors that tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(d), 416.927(d) Social Security Ruling 96-2p specifically addresses the ALJ's duty of explanation when a treating source opinion is not given controlling weight and the ALJ's decision is a denial of benefits, stating that:

> the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). The ALJ does not need to specifically list and address each factor in his decision, so long as sufficient reasons are given for the weight assigned to the treating source opinion. See Pinson v. McMahon, 3:07-1056, 2009 WL 763553, at *11 (D.S.C. Mar. 19, 2009) (holding that the ALJ properly analyzed the treating source's opinion even though he did not list the five factors and specifically address each one).

In this case, the ALJ gave sufficient reasons for assigning less weight to Dr. Goudy's opinion and F.N.P. Williams opinion. With both medical opinions, the ALJ stated that neither Dr. Goudy nor F.N.P. Williams explained the inconsistencies in Plaintiff's reports and the objective medical evidence. Details of those inconsistencies are set forth above and below in the ALJ's credibility analysis.

Accordingly, the undersigned finds the ALJ's analysis of Listing 12.03 was supported by substantial evidence and there was no error of law in weighing the medical opinion evidence of Dr. Goudy or F.N.P. Williams. Therefore, the undersigned recommends that the ALJ's decision be affirmed with regard to this issue.

3.      **The ALJ correctly performed a credibility analysis and residual functional capacity at step four since Plaintiff did not meet a listing**

The Plaintiff asserts that the ALJ's credibility determination did not recognize Ms. McKenzie's schizophrenia symptoms as consistent with schizophrenia. (Pl.'s Br. at 8). Plaintiff suffers from a disease that causes her to distort reality and misinterpret her perceptions and experiences. (Pl.'s Br. at 9). Therefore, her inconsistencies in answering questions is consistent with her disease. (Pl.'s Br. at 9). Defendant argues that the ALJ fully explained his reasoning for finding that the objective medical evidence did not support Plaintiff's subjective complaints. (Def.'s Br. at 14).

At a minimum, the Social Security Act requires that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." SSR 96-7p, 1996 WL 374,186, at *2. "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984). This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." Ryan v. Astrue, No. 5:09CV55, 2011 WL 541125, at *3 (N.D. W.Va. Feb. 8, 2011) (Stamp, J.). If the ALJ meets his basic duty of explanation, "[w]e will

reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" <u>Sencindiver v. Astrue</u>, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D. W.Va. February 3, 2010) (Seibert, Mag.) (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)).

In <u>Craig v. Chater</u>, 76 F.3d 585 (4th Cir. 1996), the Fourth Circuit developed a two-step process for determining whether a person is disabled by pain or other symptoms. That process is as follows:

> First, there must be objective medical evidence showing "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and *which could reasonably be expected to produce the pain or other symptoms alleged*." . . . Therefore, for pain to be found disabling, there *must* be show a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce" the actual pain, in the amount and degree, alleged by the claimant.
>
> . . .
>
> It is only *after* a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated. . . . Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings . . .; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.) . . .; and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it . . . .

<u>Id.</u> at 594-95 (internal citations omitted). An ALJ "will not reject [a claimant's] statements about the intensity and persistence of . . . pain or other symptoms or about the effect [those] symptoms have on your ability to work . . . solely because the available objective medical

evidence does not substantiate your statements." 20 C.F.R. § 416.929(c)(2) (alterations in

original). Social Security Ruling ("SSR") 96-7p sets out some of the factors used to assess the

credibility of an individual's subjective allegations of pain, including:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). The determination or decision "must contain

specific enough reasons for the finding on credibility, supported by the evidence in the case

record, and must be sufficiently specific to make clear to the individual and to any subsequent

reviewers the weight the adjudicator gave to the individual's statements and the reason for that

weight." at *2.

As to Plaintiff's credibility, the ALJ stated that "The claimant's allegations and

complaints have not been consistent through the disability process." (R. 26). The ALJ starts

with Plaintiff's physical impairments which are her knee and elbow. (R. 25). The ALJ clearly

goes through Dr. Orvik's records demonstrating that the objective medical evidence does not

support the extent to which the Plaintiff claims her elbow and knee limit her functioning. (R. 25). Dr. Orvik is treating her with Ibuprofen 800 and reports her musculoskeletal symptom is normal. (R. 25). Plaintiff does not find any errors in the credibility determination of her physical impairments. The ALJ properly assessed the credibility of Plaintiff's testimony about her symptoms from her physical impairments. See Craig, 76 F.3d at 585. However, Plaintiff claims the same type of analysis regarding her mental status is an error of law .

Additionally, the ALJ set forth very clearly inconsistencies in Plaintiff's reports to her treating health care providers and her reports to Dr. Goudy regarding symptoms from her mental impairments. Plaintiff's counsel points to at least four of Plaintiff's inconsistencies in his brief. (Pl.'s Br. at 9-10). It is clear that Plaintiff's mother was present at most, if not all, Plaintiff's appointments with her treating health care providers clarifying any statements made by the Plaintiff. The ALJ being the fact finder and trying to discern the truth relied heavily on the records of her treating health care providers. The ALJ was not only pointing out inconsistencies to address credibility issues, but also to give reasons why Dr. Goudy's opinion should be given less weight. Dr. Goudy relied on information from the Plaintiff that was inconsistent with the medical records, which made his opinion less reliable.

For example, the ALJ asserts that there are no reports in the medical records that Plaintiff ever had any suicidal ideations. (R. 20). However the claimant told Dr. Goudy that she had experienced suicidal ideations last year. (R. 20). Additionally, Plaintiff told Dr. Goudy she was losing weight when she was actually gaining weight as was evident by the medical records. The ALJ notes that claimant told Ms. Bates on her initial evaluation at USC in May 2011 that she had never experienced symptoms of mental illness prior to psychosis in May 2011 and her

mother confirmed. (R. 26). However, Plaintiff told Dr. Goudy that she had voices in her head since middle school that increased when her father died in 1999. (R. 27).

The ALJ went through the Craig factors in making his credibility determination. He talks about the Plaintiff's daily activities and that Plaintiff has reported stabilization in her condition. (R. 29). She has reported at USC that she is feeling great and no longer hears voices. (R. 617). She was even able to go Black Friday shopping without feeling anxious in December of 2012. (Id.).

The undersigned finds that substantial evidence supports the ALJ's credibility determination and there was no error of law.

## VI. RECOMMENDATION

For the foregoing reasons, I recommend that

1.      Plaintiff's Motion [10] for Summary Judgment be **DENIED.**

2.      Commissioner's Motion [12] for Summary Judgment be **GRANTED**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all parties who appear pro se and all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted on the 22nd day of January 2015.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE